[No. 56366–7. En Banc. January 25, 1990.]

CITIZENS FOR CLEAN AIR, ET AL, *Appellants,* v. THE CITY OF SPOKANE, ET AL, *Respondents.*

*Bricklin & Gendler,* by *David A. Bricklin,* for appellants.

*Donald C. Brockett, Prosecuting Attorney,* and *James P. Emacio, Chief Civil Deputy; Preston, Thorgrimson, Ellis & Holman,* by *Thomas F. Kingen; James C. Sloane, City Attorney,* and *Greg Smith, Assistant; Perkins Coie,* by *John H. Binns, Jr.,* for respondents.

UTTER, J.—The Superior Court for Spokane County rejected a challenge to Spokane's[1] plans to build a mass burn incinerator[2] near Spokane International Airport. We affirm the trial court's decision.

Prior to 1984, Spokane realized that its existing landfills threatened the water quality of the Spokane Rathdrum aquifer, the sole source of drinking water for the Spokane region. Some alternative to continued landfilling was required.

Spokane responded by adopting a Comprehensive Solid Waste Management Plan Update (hereinafter Plan) in December 1984. The Plan recommended that Spokane build an incinerator and phase out existing landfills. When Spokane adopted the Plan in December 1984 it also passed an ordinance to finance the incinerator with $50 million of bonds. Spokane determined that the State Environmental Policy Act of 1971 (SEPA) did not require a full environmental impact statement (EIS) evaluating the environmental consequences of the Plan. Accordingly, it published a declaration of nonsignificance for the Plan in December 1984.

RCW 70.95.094(2) requires that local government submit solid waste management plans to the Department of Ecology (DOE) for approval. The DOE indicated its concern with the Plan's lack of specific information on the incinerator and on recycling in a letter dated September 4, 1985. But the DOE conditionally approved the Plan on May 2,

---

[1]We use the word "Spokane" to refer to the City of Spokane and the County of Spokane jointly. Both are respondents in this suit.

[2]Counsel for Spokane defended the use of the term "waste to energy facility" to describe the mass burn incinerator. He pointed out that the facility produces energy. We use the term incinerator throughout this opinion for brevity, not to deny that the incinerator produces energy. Moreover, the term "waste to energy facility" obscures the fact that the incinerator burns garbage and that it leaves a residue which must be disposed of.

1986. The letter of conditional approval stated that the Plan "generally fulfills the requirements of the Solid Waste Management . . . Act".

Spokane began preparing an EIS after adopting the Plan. It published a proposed scoping document, a document delineating the scope of the proposed EIS, which indicated that the EIS would compare sites and designs for an incinerator. It held a public scoping hearing at which no one commented.

Spokane solicited and received the public's views upon the draft and supplemental draft environmental impact statements during a public comment period ending on May 30, 1986. Some who commented raised the recycling concern now raised by appellants in this litigation.

The city council and county commissioners approved a DOE grant funding the incinerator on November 17 and 18, 1986, respectively. On December 16, 1986, Spokane issued a request for proposals to build the incinerator.

On January 19, 1987, the Council for Land Care and Planning, Inc., a party in this litigation, complained in writing to the county commissioners about the inadequacies of the EIS. The Council requested a supplemental EIS (SEIS) in letters of June 30, 1987, and September 17, 1987.

An addendum to the EIS appeared in the SEPA register on April 6–10, 1987, evaluating an airport site for the incinerator. The board authorized a law firm to negotiate a contract for the construction of the incinerator on June 16, 1987.

On October 26, 1987, the city council began hearings on a proposed contract. An attorney for Citizens for Clean Air, party to this litigation, appeared at the hearing and argued, on the record, that the EIS was inadequate.

On October 30, 1987, the Council for Land Care and Planning, Inc., sent a letter to the Spokane County Commissioners which began, "Consider this the *formal appeal* of CLCP on the issuance of *Site Permit 1987–01* granted . . . October 2, 1987 and due to take effect January 1,

1988." This "appeal" did not challenge the adequacy of the existing EIS. Rather, it sought a new EIS and a supplemental EIS.

The DOE approved the design and construction contracts for the incinerator on October 30, 1987. The contract included a provision requiring Spokane to pay Wheelabrator, the contractor, to incinerate 220,000 tons of waste per year. On November 3, 1987, the City and County approved an interlocal agreement to manage the incinerator.

Citizens for Clean Air and the Council for Land Care and Planning, Inc. (hereinafter Citizens) filed suit on November 23, 1987. They alleged that Spokane violated SEPA by writing an inadequate EIS and then failed to file a supplemental EIS when they changed the site of the facility. They claimed that Spokane's solid waste management emphasized incineration at the expense of recycling and therefore violated a legislative provision giving recycling and waste reduction higher priority than incineration. *See* RCW 70.138.010(1). It was also argued that Spokane violated the law governing selection of the firm building the incinerator by using a noncompetitive vendor selection process. This process was only available to facilities "in substantial compliance with the solid waste management plans prepared pursuant to chapter 70.95 RCW", the statute regulating solid waste management plans. *See* former RCW 35.92-.024(1). Citizens argued that disbursement of the funds raised to finance the incinerator violated a municipal ordinance. *See* Spokane ordinance C–27797. The trial court ruled against them on the merits on all of these statutory claims.

Citizens also alleged that Spokane had violated article 8, section 7 of the Washington Constitution, which prohibits local governments from giving away money or lending credit. The trial court granted Spokane's motion for summary judgment on the constitutional issue.

We consider each of these issues in turn and address the issues of costs and attorney fees.

I

STATE ENVIRONMENTAL POLICY ACT OF 1971

The State Environmental Policy Act of 1971 (SEPA) requires local governments to evaluate the environmental impact of actions significantly affecting the environment. *See generally* RCW 43.21C. Citizens do not challenge Spokane's failure to do this before adopting the Plan. Rather, they challenge the legal sufficiency of the statement later adopted.

They claim that the final EIS fails to consider recycling as a partial or total alternative to incineration and that it failed to adequately consider the environmental impact of the ash residue the incinerator will generate. Citizens also argue that SEPA requires an SEIS addressing fogging and icing issues connected with the site selected near Spokane International Airport.

A. Exhaustion of Administrative Remedies.

This court will not consider SEPA claims unless plaintiffs exhaust available administrative remedies before suing. *See* RCW 43.21C.075(4). There is no administrative appeal route for the SEIS claim. We agree with the trial court that the litigants are entitled to a decision on the merits of the SEIS claim. This matter does not require extended discussion.

Spokane has argued that we should not consider Citizens' complaints about the final EIS because Citizens failed to exhaust an available administrative remedy. To determine whether the exhaustion requirement bars the final EIS claims we must decide: (1) whether administrative remedies were exhausted; (2) whether an adequate remedy was available; (3) whether adequate notice of the appeals procedure was given; and (4) whether exhaustion would have been futile.

Appellants argue that their repeated attempts to object to the EIS constitute "appeals." Nothing in the record, however, shows that appellants considered these comments "appeals" at the time.

The record contains a letter denominated an "appeal" which did not question the adequacy of the existing EIS. An attorney for appellants Citizens for Clean Air appeared at a legislative hearing in October 1987. But nothing in the record indicates that either he or the county commissioners considered his remarks to be a formal appeal. Since the record shows no attempt to use the appeals procedure provided, we conclude, as did the trial court, that Citizens made no appeal. See finding of fact 2.14.

The respondents have pointed to only one appeal procedure available to appellants. Spokane's environmental ordinance allows citizens to appeal the adequacy of a final EIS. It states:

> An administrative appeal of the adequacy of a FEIS . . . would follow the procedure for the underlying action and if there is no clearly apparent appeal body, then the appeal would be within ten calendar days to the legislative or policy making body of the particular lead agency.

Spokane County Code 11.10.170(1)(a)(iii).

Appellants argue that the appeals procedure is so poorly defined that they need not make an appeal pursuant to it. They argue correctly that it is difficult to tell when to file an appeal simply by reading the ordinance.

Generally, this court requires exhaustion only when the administrative remedy is *adequate. See State v. Tacoma–Pierce Cy. Multiple Listing Serv.,* 95 Wn.2d 280, 283–84, 622 P.2d 1190 (1980). This court has said in dicta that it imposes the exhaustion requirement only when "*clearly defined* machinery" exists for the "submission, evaluation and resolution" of complaints. (Italics ours.) *Multiple Listing,* 95 Wn.2d at 284 (quoting *Retail Store Employees Union, Local 1001 v. Washington Surveying & Rating Bur.,* 87 Wn.2d 887, 907, 558 P.2d 215 (1976)).

While a process for appeal must exist, we have never held that the ordinance describing the procedure must be clear. The dicta in *Multiple Listing* goes to the adequacy of the administrative procedures themselves. To establish that the procedures themselves are so poorly defined that we

should excuse exhaustion, the litigant must attempt to appeal. A litigant who makes a sincere effort to clarify ambiguities in the ordinance and to use the appeal process may complain about poorly defined administrative machinery. If we are persuaded that no "clearly defined machinery" exists for resolving specific complaints, we will excuse exhaustion.

In *Multiple Listing,* we did not require exhaustion because the Department of Licensing, the relevant administrative agency, did not have the authority to resolve the litigant's complaint. *See Multiple Listing,* 95 Wn.2d at 284. In *Retail Stores,* the agency did have authority to hear the complaint and we required exhaustion. *Retail Stores,* 87 Wn.2d at 906.

Lack of clear procedure can make a remedy inadequate. But the litigants who wish to establish that the procedure is so poor as to be inadequate cannot rely on bad draftsmanship alone. It is not unfair to expect citizens groups to use available administrative procedures. Fairness to the agency requires that would-be litigants try to clarify ambiguity before going to court. Citizens have not shown that Spokane has no "clearly defined machinery" for the resolution of complaints about the adequacy of a final EIS.

Citizens argue that Spokane's failure to notify them about the administrative appeals procedure precludes requiring exhaustion. The trial court properly concluded that Spokane did notify them. Moreover, the notice given was legally adequate.[3]

The record shows constructive notice of the appeals procedure. The procedure was available in a duly enacted ordinance. Moreover, Spokane published notice of the EIS.

Because Citizens had some notice, this case is factually distinguishable from *Gardner v. Pierce Cy. Bd. of Comm'rs,* 27 Wn. App. 241, 617 P.2d 743 (1980). In that case the

---

[3]Our conclusion that notice was given makes it unnecessary for us to consider Spokane's argument that no notice of any sort is required.

Court of Appeals declined to apply the exhaustion require-ment because the plaintiffs had no notice at all of the dec-laration of nonsignificance at issue in that case. The litigant in *Gardner* had no way of knowing that an appealable event had occurred until the deadline for appeals had passed. The court therefore concluded that he had "not enjoyed a fair opportunity to exhaust the administrative process". *Gardner*, 27 Wn. App. at 243–44. Here, Citizens were aware of the EIS.

Citizens argue that they must receive actual notice of the time and place to begin an appeal. The record does not show that Spokane explicitly told them where and when to appeal. Citizens fail to show that the law requires such specific notice.

■ This court has said that generally a right to appeal is "subject to such valid restrictions . . . as the legislative body may place upon it." *Seattle Shorelines Coalition v. Justen*, 93 Wn.2d 390, 397–98, 609 P.2d 1371 (1980). In *Shorelines*, we required the litigant to read the official notices and ordinances and ascertain for himself the time and conditions for making a challenge. *Shorelines* estab-lishes a general rule that local governments need not spe-cifically notify interested parties of the time and place for making an appeal.

General principles alone, however, cannot resolve this case. Unlike the litigants in *Shorelines*, Citizens cite a spe-cific administrative rule under SEPA which they claim gives them a right to specific actual notice. *See* WAC 197–11–680(5)(a).

■ WAC 197–11–680(5)(a) states, "Official notice of the date and place for commencing an appeal must be given . . .". But Spokane argues that these requirements apply only to judicial appeals. Spokane points out that WAC 197–11–680(4), pertaining to judicial appeals, has cross references to subsection (5), while WAC 197–11–680(3) on agency administrative appeals has none.

A fair reading of the regulation as a whole shows that it applies only to judicial appeals. As such, we decline to read

it in a manner inconsistent with the common law rule described in *Shorelines.*

Citizens have no right to actual notice of the time and place for beginning an administrative appeal. They had legally adequate notice of the appeals procedure. If doubts existed about when to file, they could have inquired. Unlike the litigant in *Gardner,* Citizens had a fair opportunity to appeal.

■ Citizens have argued that we should excuse their failure to exhaust the available remedy, because an appeal would be futile. We will not require litigants to exhaust administrative remedies if doing so would be futile. But the policies underlying exhaustion impose a substantial burden on a litigant attempting to show futility. *See Estate of Friedman v. Pierce Cy.,* 112 Wn.2d 68, 768 P.2d 462 (1989).

We explained the policies underlying exhaustion in *Orion Corp. v. State,* 103 Wn.2d 441, 456, 693 P.2d 1369 (1985) and reiterated them in *Friedman,* 112 Wn.2d at 78. The exhaustion requirement (1) prevents premature interruption of the administrative process; (2) allows the agency to develop the factual background on which to base a decision; (3) allows the exercise of agency expertise; (4) provides a more efficient process and allows the agency to correct its own mistake; and (5) insures that individuals are not encouraged to ignore administrative procedures by resort to the courts.

Not all of these policies apply in every case. Here, for instance, nobody has argued that Citizens prematurely interrupted the administrative process. Indeed, Spokane has argued that their appeal is too late.

Most of these policies, however, support observance of the exhaustion requirement in this case. For example, administrative appeals allow "the agency to develop the necessary factual background on which to base a decision". *Friedman,* 112 Wn.2d at 78 (quoting *Orion Corp. v. State, supra* at 456-57). One of Citizens' claims is that the treatment of ash disposal in the EIS was inadequate. Since the EIS does include some information about incinerator ash, a

judgment about whether the EIS treats it adequately requires facts. Had Citizens made a formal appeal, they might have presented facts which would persuade Spokane that the existing statement needed revision, thus obviating the need for litigation.

The requisites of judicial review also support strict adherence to the exhaustion requirement. In *Friedman,* we pointed out that the claim at issue in that suit, an inverse condemnation claim, was difficult to assess where the litigant had not exhausted administrative procedures. Similarly, we cannot evaluate arguments about the adequacy of an EIS, absent an administrative record showing why treatment of an issue is inadequate.

■ Most of the policies underlying exhaustion support its application in this case. Exhaustion will be excused only if the litigant shows that an administrative appeal would be futile.

This court has often excused exhaustion when the administrative remedy was legally inadequate. *See State v. Tacoma–Pierce Cy. Multiple Listing Serv.,* 95 Wn.2d 280, 283–84, 622 P.2d 1190 (1980) (excusing exhaustion when agency lacked authority to remedy the problem); *Zylstra v. Piva,* 85 Wn.2d 743, 745, 539 P.2d 823 (1975) (excusing exhaustion when applicability of statute or contract giving remedy was at issue). But Citizens do not contend that Spokane lacked the legal authority to address their complaints. Rather, Citizens argue that the facts of this case justify futility. Citizens assume a difficult burden since the factual circumstances of a case rarely justify a finding of futility. *Friedman,* 112 Wn.2d at 74; *cf. Orion,* 103 Wn.2d at 458 (finding factual futility).

Specifically, Citizens argue that exhaustion would be futile because the same officials who would rule on a formal appeal had already heard and rejected their complaints. Spokane held public hearings at which Citizens asked for more environmental review, but Spokane continued with its plans. The federal courts have excused exhaustion on similar grounds. *See National Wildlife Fed'n v. Burford,* 835

F.2d 305, 317 (D.C. Cir. 1987) (excusing exhaustion when plaintiff had brought his complaints to the attention of officials through letters); *Safir v. Kreps,* 551 F.2d 447, 452 (D.C. Cir.) ("So long as the appellant *or some other party* has put an objection on the record, the obligation to exhaust is discharged." (Italics ours.)), *cert. denied,* 434 U.S. 820 (1977).

Citizens fail to show that exhaustion would be futile in this case. We will not assume that an appeal focused on specific issues might not have led to changes. In particular, such an appeal might have forced Spokane and Citizens to focus on the particular facts relevant to the issues being appealed.

█ Citizens also claim that "Spokane perceived itself as too tied to the incinerator to consider other alternatives in the EIS." Brief of Appellants, at 53. The record contains no direct evidence that Spokane would not consider alternatives to the incinerator. Nor does the record contain direct evidence of the self–perception of Spokane's county commissioners or the city council. But it does suggest that Spokane made a policy choice to build an incinerator. Our precedents show we cannot infer futility from a policy choice alone.

In *Orion Corp. v. State, supra,* we considered a property owner's takings claim even though he had not exhausted his administrative remedies. We did so because Skagit County had already created the Padilla Bay Estuarine Sanctuary in which the litigant's land was the major parcel. The County had made a policy choice to prevent development in Padilla Bay. Indeed, the County had made more than just a policy choice. The combination of deposition testimony of officials and land use restrictions convinced us that an administrative appeal would be "vain and useless." *Orion,* at 445–55, 458–60.

In this case, officials have not indicated how they would treat an appeal of the EIS. No legal restrictions prevented Spokane from responding to a timely appeal.

The facts of this case resemble the facts of *Friedman* more closely than the facts of *Orion.* In *Friedman,* we imposed the exhaustion requirement on a landlord seeking review of an inverse condemnation claim, 112 Wn.2d at 69, notwithstanding an open space policy applicable to the litigants' land. 112 Wn.2d at 73. The possibility that Pierce County might approve some development in spite of the policy precluded excusing exhaustion. *Friedman,* at 73, 81. Similarly, the possibility that Spokane might revise its EIS or its policy to meet Citizens' concerns, notwithstanding its incinerator policy, precludes finding futility here. Citizens must *prove* futility.

Citizens have argued that the perceived financial cost of abandoning the incinerator or conducting more environmental review would have prevented Spokane from addressing their complaints. We are not persuaded that the costs of abandoning or delaying the incinerator are so great that Spokane would not have considered challenges to the EIS. Completing the project has far greater cost than abandoning it. Considerations of fairness and practicality do not outweigh the policies favoring exhaustion in this case.

B. The Merits.

The failure to exhaust the available administrative remedy makes it unnecessary for us to consider the adequacy of the EIS. There remains for decision the claim that the site change made after Spokane filed the EIS required an SEIS. No appeal procedure existed for appealing the failure to file an SEIS. We conclude, however, that Spokane's environmental review was legally adequate and that it need not file an SEIS.

The original EIS considered three alternative locations for the incinerator. One of these sites was near the Spokane International Airport. The EIS evaluation of the airport site included some information on fogging problems the incinerator might cause for the airport. The airport site ultimately selected was not among the alternatives originally considered, but it was across the road from the airport site evaluated in the original EIS.

Although the questions raised about the adequacy of environmental review are questions of law subject to de novo review, *Barrie v. Kitsap Cy.,* 93 Wn.2d 843, 854, 613 P.2d 1148 (1980), this court will give the agency's decision "substantial weight". RCW 43.21C.090. A "rule of reason" is used in evaluating environmental review. *See Cheney v. Mountlake Terrace,* 87 Wn.2d 338, 344, 552 P.2d 184 (1976).

■ Substantial changes in a proposal or new information about adverse environmental impacts may create a need for an SEIS. *See* WAC 197–11–600(4)(b). In this case, however, the change was a minor siting change. A minor siting change does not require an SEIS. *See Nisqually Delta Ass'n v. DuPont,* 103 Wn.2d 720, 724, 728–29, 696 P.2d 1222 (1985).

■ The new information about the fogging problem which came to light after the EIS was filed is too insubstantial to justify overturning the agency's decision not to file an SEIS. *See Barrie v. Kitsap Cy. Boundary Review Bd.,* 97 Wn.2d 232, 643 P.2d 433 (1982) (declining to require an SEIS because new information was not significant). The regulations do not require an SEIS if the existing documents cover the significant environmental impacts. WAC 197–11–600(3)(b)(ii).

## II
### THE LEGISLATIVE PRIORITIES

Citizens ask this court to adjudicate the question of whether Spokane's solid waste management conforms to priorities established by the Legislature. The legislative priorities do not by themselves create mandatory duties enforceable by this court. Therefore, it is not this court's role to undertake the sweeping inquiry into Spokane's actions and omissions over the past years urged upon us by Citizens.

Two statutes contain sections establishing recycling as the top legislative priority, the solid waste management act and the special incinerator ash disposal act. *See* RCW

70.95.010 (solid waste management act);[4] RCW 70.138.010 (the ash act).[5] The solid waste management act establishes a comprehensive statewide program for solid waste handling. RCW 70.95.020. It assigns primary responsibility for solid waste handling to local government, RCW 70.95-.020(1). On the other hand, it adopts and provides for the enforcement of basic minimum performance standards for solid waste handling. RCW 70.95.020(3).

The act requires counties and cities to develop solid waste management plans jointly, RCW 70.95.080, and regulates the plans' general content. RCW 70.95.090. The act assigns numerous duties to the DOE. For example, the DOE has authority to review and deny permits for solid waste facilities. *See* RCW 70.95.180–.190. Local governments must submit their solid waste management plans to the DOE for approval. RCW 70.95.094(2).

The second statute with a legislative priorities provision is the ash act. The act exempts incinerator residue—ash—from the strictures of the Hazardous Waste Management Act. *See* RCW 70.138.010(2). It requires persons generating ash to develop management plans and submit them to the DOE for approval. RCW 70.138.030. The ash act grants the DOE rulemaking authority to regulate the residue. RCW

---

[4]This provision reads:
"The legislature finds:
" . . . .
"(8) The following priorities for the collection, handling, and management of solid waste are necessary and should be followed in descending order as applicable:
"(a) Waste reduction;
"(b) Recycling, with source separation of recyclable materials as the preferred method;
"(c) Energy recovery, incineration, or landfill of separated waste;
"(d) Energy recovery, incineration, or landfilling of mixed wastes."

[5]RCW 70.138.010 states:
"The legislature finds:
"(1) Solid wastes generated in the state are to be managed in the following order of descending priority: (a) Waste reduction; (b) recycling; (c) treatment; (d) energy recovery or incineration; (e) solidification/stabilization; and (f) landfill."

70.138.030(6). The DOE enforces the act. *See* RCW 70.138-.040 (civil penalties); RCW 70.138.050 (violation orders); RCW 70.138.060 (injunctive relief); *cf.* RCW 70.138.070 (criminal penalties).

The legislative findings sections of both statutes establish the priority of recycling and waste reduction over incineration. *See* Laws of 1989, ch. 431, § 1(8); RCW 70.138.010(1). As Citizens suggest in their brief, the history of the legislation is illuminating. It does not, however, support their view that the ash act by itself creates a mandatory duty enforceable by this court.

The Legislature first introduced legislative priorities for solid waste in the 1984 amendments to the solid waste management act. *See* Laws of 1984, ch. 123, § 1. The act established priorities which "should be followed . . . as applicable."

In 1987, without repealing the priorities section of the solid waste management act, the Legislature passed a similar provision as part of the ash act. But the new law had mandatory language; it provided that "[s]olid wastes generated in the state *are to be managed*" in accordance with the priorities. (Italics ours.) Laws of 1987, ch. 528, § 1 (codified at RCW 70.138.010(1)).

In 1989, the Legislature passed new amendments to the solid waste management act. Laws of 1989, ch. 431. The Legislature amended the priorities section. Laws of 1989, ch. 431, § 1(8). But the Legislature left the nonmandatory language of the 1984 priorities section intact. The 1989 amendments to the solid waste management act did not repeal the mandatory language in the ash act. Thus, a section with mandatory language and a priorities section with precatory language stand together.

The priority sections of both acts are found in sections denominated legislative findings. The most recent amendments keep the precatory language. Moreover, the most recent amendment to the solid waste management act is more specific about priorities than the ash act.

█ Generally, provisions of a specific more recent statute prevail in a conflict with a more general predecessor. *See Muije v. Department of Social & Health Servs.*, 97 Wn.2d 451, 453, 645 P.2d 1086 (1982). No reason exists to depart from that rule. On the contrary, we are loath to assume responsibility for determining whether legislative actions conform to a set of priorities absent specific unequivocal legislation on the subject.

Our narrow holding on this issue makes it unnecessary to consider Spokane's argument that the legislative priorities are only advisory objectives to be implemented by local decisionmaking. A holding that the legislative priorities were only advisory might be read as undermining the authority of the DOE to implement these objectives through its review of solid waste management plans and ash disposal permits.[6]

Because the DOE is not a party to this case, it is inappropriate to comment at all about its authority under the solid waste management act or the ash act. Here, the DOE granted a siting permit, helped fund the incinerator, and conditionally approved the solid waste management plan. We hold only that the current legislation by itself does not require this court to evaluate the policy, programs, and studies of local government to determine whether the priorities evinced conform with the desires of the Legislature.

### III
#### VENDOR SELECTION PROCEDURE

The vendor selection process used by Spokane is only available "for facilities that are in substantial compliance with the solid waste management plans prepared pursuant to chapter 70.95 RCW." Former RCW 35.92.024(1). The

---

[6]The statutes at issue have provisions which may give the DOE or the health department authority to require local government to recycle or study recycling. For example, the incinerator ash act requires plans for disposing of incinerator ash. These plans must "[i]dentify alternatives for managing solid waste prior to incineration for the purpose of . . . reducing the quantity of . . . ash". RCW 70.138.030(1)(b). The DOE reviews these plans. RCW 70.138.030(2).

parties apparently agree that the incinerator is in substantial compliance with Spokane's Plan. Citizens argue, however, that the Plan was not prepared pursuant to the statute.

RCW 70.95.094(2) requires that plans be submitted to the DOE for approval. Spokane submitted the plan and the DOE gave its conditional approval. The letter of May 2, 1986, granting conditional approval, states that the plan "generally fulfills the requirements of the Solid Waste Management . . . Act." Therefore, the Plan was prepared "pursuant to" the statute and Spokane complied with the law governing the vendor selection process.

## IV
### NOTE ORDINANCE

Citizens argue that the trustee of the construction fund used to finance the incinerator violated his obligations under the ordinance authorizing the $50 million bond issue to finance the incinerator. *See* Spokane ordinance C–27797. A provision in this ordinance forbids certain expenditures without a preliminary feasibility study.

Spokane required the feasibility study to protect the noteholders. *See* Spokane ordinance C–27797, at § 1.12. The city redeemed all of the notes and paid accrued interest on April 6, 1989. Accordingly, the issue is moot.

## V
### GIFT AND LENDING OF CREDIT

Citizens argue that the contracts between Spokane and Wheelabrator constitute gifts of public moneys and a lending of public credit. The Washington Constitution forbids both. *See* Const. art. 8, § 7.[7]

The trial court granted respondents' motion for summary judgment on Citizens' constitutional law claims.

---

[7]Article 8, section 7 of the Washington Constitution states:

"No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation."

In reviewing summary judgment, this court views the facts and reasonable inferences in the light most favorable to the nonmoving party. *Reese v. Sears, Roebuck & Co.,* 107 Wn.2d 563, 567, 731 P.2d 497 (1987). Construing all the facts in the light most favorable to Citizens, we conclude that the trial court correctly granted Spokane's motion.

 The constitutional prohibition against gifts of public moneys has a 2–prong analysis under *Tacoma v. Taxpayers,* 108 Wn.2d 679, 743 P.2d 793 (1987). If the government expends funds to carry out a fundamental governmental purpose, no unconstitutional gift occurs. 108 Wn.2d at 702. If the expenditures are pursuant to the government's proprietary authority, the court focuses on consideration and donative intent to determine if a gift has occurred.

The prohibitions of article 8, section 7 do not apply to recognized governmental functions. *See In re Marriage of Johnson,* 96 Wn.2d 255, 262, 634 P.2d 877 (1981); *Department of Labor & Indus. v. Wendt,* 47 Wn. App. 427, 435, 735 P.2d 1334 (1987).[8] Otherwise, enforcement of the constitutional prohibition would destroy the efficiency of agencies performing essential governmental functions. *Johnson,* 96 Wn.2d at 262 (quoting *Rauch v. Chapman,* 16 Wash. 568, 575, 48 P. 253 (1897)). We do not treat funds expended for these purposes as gifts because the public benefit is the consideration.

 Disposal of solid waste is a recognized governmental function. *King Cy. v. Algona,* 101 Wn.2d 789, 794, 681 P.2d 1281 (1984) (citing *Spokane v. Carlson,* 73 Wn.2d 76, 81, 436 P.2d 454 (1968)). Thus, as a matter of law, Spokane's contract with Wheelabrator for the disposal of solid waste is not a gift of public moneys in violation of article 8, section 7 of the Washington Constitution.

---

[8]These cases actually interpreted article 8, section 5 of the constitution. This provision restricts the State in much the same way that article 8, section 7 restricts local government. We interpret the two provisions identically. *See Tacoma v. Taxpayers,* 108 Wn.2d 679, 701 n.13, 743 P.2d 793 (1987); *Higher Educ. Facilities Auth. v. Gardner,* 103 Wn.2d 838, 845, 699 P.2d 1240 (1985); *In re Marriage of Johnson,* 96 Wn.2d 255, 261 n.1, 634 P.2d 877 (1981).

Citizens contend that Spokane's financing arrangements constitute a loan of its credit in aid of Wheelabrator. They argue that the City serves as a financial conduit for the company.

In *Lassila v. Wenatchee,* 89 Wn.2d 804, 811–12, 576 P.2d 54 (1978), we sustained a challenge to a transaction in which the City of Wenatchee bought a property and immediately sold it to a private party because this constituted a loan of credit in aid of an individual. Citizens analogize the transaction with Wheelabrator to the transaction we invalidated in *Lassila.* They argue that the City borrowed money from the public to construct the incinerator and then sold the new facility to Wheelabrator.

This argument is unpersuasive. The city did not sell the incinerator to Wheelabrator. Its contract with Wheelabrator is a contract for expert services, not a sales contract.

Nor has Spokane lent its credit or loaned money to Wheelabrator. It has simply purchased services. This court has generally required actual lending of credit in lending of credit cases. *See Ferndale v. Friberg,* 107 Wn.2d 602, 609, 732 P.2d 143 (1987) (upholding a tax exemption against a lending of public credit challenge); *Higher Educ. Facilities Auth. v. Gardner,* 103 Wn.2d 838, 699 P.2d 1240 (1985) (upholding nonrecourse bond issue benefiting nonprofit universities). There is no issue of triable fact as to whether the City violated the constitutional lending of credit restriction.

## VI
### ATTORNEY FEES

Spokane seeks attorney fees on the constitutional law claims which it regards as groundless. Citizens' constitutional claims are weak, but not frivolous. We decline to award attorney fees in this case.

## VII
### COSTS

Citizens argue that the trial court's award of costs was excessive. Cost awards are within the discretion of the

trial court. *St. Germain v. St. Germain,* 22 Wn.2d 744, 759, 157 P.2d 981 (1945). An appellate court will not overturn the trial court's ruling as to costs unless it has abused its discretion. *Startin v. Startin,* 4 Wn. App. 339, 340, 481 P.2d 452 (1971).

Citizens argue that we should review the trial court's cost ruling de novo because it was based solely on affidavits. *See State v. Rowe,* 93 Wn.2d 277, 280, 609 P.2d 1348 (1980) ("Where the interpretation of a document must be made from the face of the instrument itself, this court is in as good a position as the trial court to interpret its meanings."). Neither *Rowe* nor *Webster v. State Farm Mut. Auto. Ins. Co.,* 54 Wn. App. 492, 495, 774 P.2d 50, *review denied,* 113 Wn.2d 1018 (1989), the cases cited by Citizens to support this argument, deal with costs. Trial courts usually award costs based on affidavits. We decline to eviscerate the settled rule that cost awards will only be reversed if manifestly unreasonable. *See Allard v. First Interstate Bank of Wash., N.A.,* 112 Wn.2d 145, 148, 768 P.2d 998, 773 P.2d 420 (1989) (stating that "a trial court abuses its discretion" if its decision is "manifestly unreasonable" and upholding an award of attorney fees). A review of the affidavits shows that the trial court did not abuse its discretion.

The trial court's decisions with respect to the constitutional and statutory claims presented are affirmed. Spokane's request for attorney fees is rejected and we affirm the trial court's cost award.

CALLOW, C.J., BRACHTENBACH, DOLLIVER, DORE, ANDERSEN, DURHAM, and SMITH, JJ., and PEARSON, J. Pro Tem., concur.