137 P.3d 31 (2006)
133 Wash.App. 503
PRESERVE OUR ISLANDS, People for Puget Sound, Washington Environmental Council, King County Department of Development and Environmental Services, Appellants,
v.
SHORELINES HEARINGS BOARD, Respondent,
Northwest Aggregates Company (a/k/a Glacier Northwest), Respondent.
Nos. 55655-0-I, 55656-8-I.
Court of Appeals of Washington, Division 1.
June 19, 2006.
*34 Michael Joseph Sinsky, Office of the Prosecuting Attorney, Ralph Howard Palumbo, Polly L. McNeil, Summit Law Group, Seattle, WA, for Appellants King County Department of Development and Environmental Services.
David Scott Mann, Michael W. Gendler, Seattle, WA, for Appellants People For Puget Sound, Preserve Our Island, Washington Environmental Council.
William Francis Cronin, Attorney at Law, Stephen Howard Roos, George Kresovich, T. Ryan Durkan, Attorney at Law, Seattle, WA, for Respondent Northwest Aggregates Company.
AGID, J.
¶ 1 In these consolidated cases, Preserve Our Islands (POI) and King County (County) appeal the Shorelines Hearings Board's (Board) order requiring the County to issue shoreline substantial development and conditional use permits to Glacier Northwest for its proposed barge-loading facility on Maury Island. The facility will allow Glacier to transport large quantities of sand and gravel off island from its adjacent upland mine. Appellants contend the facility is not water dependent, as required by the King County Shoreline Master Program (Master Program), because the mining operation is the principal use of Glacier's property and it has functioned without barging for many years. They also maintain the facility is inconsistent with shoreline management policies.
¶ 2 But the County has zoned Glacier's site for commercial mining and designated it as mineral resource land under the Growth Management Act without any restrictions on the size of the use. The current principal use of the site is a commercially significant mining operation, regardless of how it was used in the past. Glacier's mine is located on a small island without viable large-scale ground transportation options and cannot operate consistent with its designated principal use without barging. The barge-loading facility is thus an integral part of the principal use, and the entire facility must use the shorelines to operate consistent with its County zoning. The Board correctly concluded the barge-loading facility is water dependent. Substantial evidence supports the Board's conclusion that Glacier's mitigation measures and the Board's conditions make the facility consistent with shoreline management policies. We affirm the Board's order requiring the County to issue Glacier's permits.

FACTS
¶ 3 Northwest Aggregates Company, a.k.a. Glacier Northwest ("Glacier"), owns a 235-acre sand and gravel mine on the southeast shore of Maury Island.[1] The mine is located in the upland portion of the site. The State owns the bedlands. Various owners have mined the site since the 1940s. In 1968, the owner built a barge-loading facility. It consisted *35 of a wooden dock, dolphins for mooring barges, and a conveyer/loading system leading from the upland mine over the beach to the dock. The facility used barges to transport sand and gravel in 1968, 1969, 1971, and 1978. Production peaked in 1978 when the mine produced approximately 2.8 million tons of sand and gravel, primarily for projects around Puget Sound.
¶ 4 Since 1978 the mine has produced between 10,000 and 20,000 tons per year, shipped by truck to sites around Maury Island and adjacent Vashon Island. The barge-loading facility has not been used since 1978 and has fallen into disrepair. Glacier has removed the facility's electrical components, but the owners, including Glacier, have always timely renewed their aquatic lands leases from the Washington State Department of Natural Resources.[2]
¶ 5 In May 1998, Glacier applied to the County for a shoreline exemption to repair the barge-loading facility in order to resume barging material from the Maury Island mine.[3] Glacier initially proposed to immediately replace some of the wood pilings and phase in the rest of the repairs over the next 5 to 15 years. Most of the decking and superstructure was to be replaced because it had deteriorated substantially. Glacier proposed to mine and barge up to 7.5 million tons per year using the renovated facility.[4]

Permits and SEPA Review
¶ 6 On August 11, 1998, the County issued a State Environmental Policy Act (SEPA) Determination of Significance requiring Glacier to prepare an Environmental Impact Statement (EIS) for the proposal. On July 21, 1999, the County issued a draft EIS (DEIS).[5] On June 27, 2000, it issued the final EIS (FEIS). The FEIS concluded that the project, as proposed, would likely result in significant adverse environmental impacts.[6] It recommended several mitigation measures to avoid or minimize adverse impacts or enhance environmental quality. It also concluded that completely replacing the dock was a preferred alternative to repairing it. In response to concerns identified in the FEIS, Glacier modified its proposal several times. After four years, the County denied Glacier's shoreline exemption application because, once the project was revised to accommodate the FEIS recommendations, it could no longer qualify as normal maintenance and repair.
¶ 7 In September 2002, Glacier submitted applications for substantial shoreline development and shoreline conditional use permits to, as the FEIS recommended, replace the entire barge-loading facility: the dock and pilings, trestle, conveyor, and dolphins. The new dock would be open-grated steel with approximately 75 percent open area and would extend farther into the water than the dock repair proposal. The September 2002 proposal also incorporated several other mitigation measures suggested in the FEIS.
¶ 8 Due to the extensive modifications to Glacier's proposal, the County required additional SEPA review to evaluate the project changes and consider additional information from Glacier and the community.[7] Glacier and POI submitted large amounts of technical information on the effects of tugboat propeller *36 wash on eelgrass patches around the proposed facility. The County hired a third party consultant to assess the probable significant impacts of propeller wash. Based on the consultant's analysis, the County suggested, and Glacier adopted, several additional mitigation measures to further minimize impacts on eelgrass, including lengthening the dock again. On March 16, 2004, the County issued an addendum to the FEIS (Addendum) stating that Glacier's project, as modified, was unlikely to have significant adverse environmental impacts beyond those identified in the FEIS. It concluded that a Supplemental EIS was not required before the County made a decision on Glacier's permit applications.
¶ 9 That same day, March 16, 2004, the Director of the Department of Development and Environmental Services (DDES) denied Glacier's shoreline permit applications, apparently concluding for the first time since Glacier filed its 1998 application that the proposed barge-loading facility was not water dependent. DDES also ruled that the facility was inconsistent with certain policies of the Master Program and was not a legal nonconforming use. But, confusingly, it also determined that the project is a resource use rather than a prohibited industrial or commercial use.
¶ 10 Glacier appealed the denial to the Board. POI also appealed the resource use determination and adequacy of the FEIS and Addendum. The Board granted summary judgment for Glacier on the water dependency and resource use issues. After an eight-day hearing, the Board reversed DDES's conclusion that the proposed facility was inconsistent with shoreline management policies. Although it concluded the facility was an authorized permitted use, it went on to reverse the Director's ruling that the facility failed to meet the criteria for a legal nonconforming use. The Board concluded the FEIS was adequate and a Supplemental EIS was not required. It ultimately reversed DDES's denial of shoreline development permits and remanded with orders to issue the permits with the Board's conditions. POI and the County appealed to this court.[8]

DISCUSSION
¶ 11 POI and the County argue the Board made several errors of law in reversing DDES's determination that Glacier's proposed barge-loading facility fails to satisfy the requirements for shoreline permits. Glacier maintains the Board correctly determined that the facility meets all permit requirements. POI argues separately that the FEIS and Addendum were inadequate and a supplemental EIS is required.

Shoreline Permits
¶ 12 The Shoreline Management Act (SMA), chapter 90.58 RCW, requires each local government to develop a master program for the use of shorelines within its jurisdiction.[9] The SMA mandates that shoreline development in Washington be consistent with the policies of the SMA and the local government's master program.[10] RCW 90.58.140 requires local governments to establish a program to administer and enforce a permit system for substantial developments within shorelines.[11] The Board is the quasi-judicial body which hears all appeals from local government and Department of Ecology decisions made under the SMA or shoreline master plans, including granting, denying, or rescinding shoreline permits.[12]
¶ 13 The County adopted its Master Program in 1978. The Master Program consists *37 of the King County Shoreline Policies (Shoreline Policies) and King County Shoreline Code, chapter 25.04 KCC, (Shoreline Code). The Master Program limits shoreline use and specifies criteria for issuing development permits within County shorelines. As modified to comply with the FEIS, Glacier's barge-loading facility requires both a shoreline substantial development permit and a shoreline conditional use permit.[13] Under the Master Program, the area in which Glacier's project is located is designated as part of the Conservancy Environment.[14]

I. Standard of Review and Deference

¶ 14 As an initial matter, the parties disagree on the standard of review and to which agency, if any, this court should defer.[15] The Administrative Procedure Act (APA), RCW 34.05, governs judicial review of the Board's decision.[16] Review is based on the record before the Board.[17] Interpretation of the SMA and local government shoreline regulations involves questions of law, which this court reviews de novo.[18] In doing so, we accord "`deference to an agency interpretation of the law where the agency has specialized expertise in dealing with such issues, but we are not bound by an agency's interpretation of a statute.'"[19] In reviewing matters of law, we may reverse the Board's decision only if the Board "engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure; ... [or] has erroneously interpreted or applied the law."[20] The burden of demonstrating the Board erroneously interpreted or applied the law rests with the party asserting the error.[21]
¶ 15 POI argues that if any deference is due, it should be accorded to the County rather than the Board because the County wrote the Master Program,[22] and the SMA grants local governments primary responsibility for "administering the regulatory program consistent with the policy and provisions of [the SMA]."[23] While this is true as far as it goes, our courts have long recognized that the Board "draws on its special knowledge and experience as the entity charged with administering and enforcing the [SMA]."[24] The important distinction here is that the Board hears cases like this one de novo,[25] and it does not accord deference to *38 the local government's decision.[26] This is unlike review under the Growth Management Act (GMA), which requires that the Growth Management Hearings Board defer to the decisions and actions of counties and cities under the GMA.[27] There is no similar provision in the SMA, likely because its passage did not require the compromises necessary to enact the GMA.[28] Because we review the Shorelines Hearings Board's decision, not that of the local government, to the extent we give deference, it is to the Board. This is particularly true where it has applied its "specialized knowledge and expertise"[29] following an extensive fact-based inquiry. It would be inappropriate for this court to accord deference to the Director of DDES when that was not the posture in which the statute directs the Board to decide the matter.[30]

II. Water Dependency

¶ 16 Under KCC 25.32.010, the County issues shoreline substantial development permits if the proposed development is consistent with SMA policies and the guidelines and regulations of the County's Master Program. In a Conservancy Environment, the Shoreline Code permits only water dependent uses or development waterward of the high water mark.[31] The Code defines a water dependent use as "a principal use which can only exist where the landwater interface provides biological or physical conditions necessary for use."[32] The Code defines a water related use, specifically prohibited in the Conservancy Environment, as
a principal use which is not intrinsically dependent on a location abutting the ordinary high water mark but which:
A. Promotes the public's enjoyment of or access to the water; or
B. Gains a cost savings or revenue-differentiating advantage, which is not associated with land rents or costs, from being located within the shorelines of the state that could not be obtained at an upland location;
such uses include but are not limited to residential development, boat sales or restaurants.[33]
¶ 17 Appellants argue the Board erred by ruling the proposed development is water dependent. They contend the term "principal use" is unambiguous, and the mining operation is water related because the barge-loading facility merely provides an economic advantage to the mine, which has operated for most of its existence without barging. Glacier argues the term "water dependent" is ambiguous because "principal use" is not defined. It contends the barge-loading facility is an integral part of the principal use because the mine could not function commercially without it.
¶ 18 The Board ruled that the mining operation as a whole is the principal use, transportation of minerals is an essential part of a mining operation, and for this island site a barge-loading facility is necessary for the mine "to operate consistent with its designation as a mineral land of long term commercial significance." The Board stated, "when operated at a commercially significant scale, the Glacier site requires barging of sand and gravel, and the designation of the island site *39 as a mineral land of long-term commercial significance is an objective action taken by the County in 1994." It held
marine transportation of sand and gravel was necessary to provide a quantity of material similar to that which Glacier proposes to mine and export now and in the future. The fact that the site has been used to mine a lesser "local" annual quantity until demand resumes does not mean that the necessity for barge transportation has been lost or diminished. The "necessity of the land-water interface" at this facility is consistent not only with the prior use of the site as a source of sand and gravel in King County, but also serves to give purpose and effect to the site's GMA mineral designations and to the KCSMP, which allows mining in the Conservancy Environment and acknowledges the marine location of sand and gravel as noted in King County's master program policies.
¶ 19 In reviewing an agency's summary judgment ruling based on undisputed facts, we are governed by the APA standard of review. We may reverse the Board if it has erroneously interpreted or applied the relevant law.[34] As we have already decided, we will give weight and deference to the Board's interpretation of statutes and regulations it enforces, but ultimately our review is de novo.

A. Principal Use

¶ 20 The parties dispute whether the term "principal use" is ambiguous under the Master Program. Appellants argue that the term is unambiguous and does not include a barge-loading facility which is merely accessory to the mine itself, which is the principal use. But that argument is tautological because it presumes the answer the appellants want us to reach. Glacier argues that "principal use" is ambiguous, and the Board had to interpret it. Based on the property's resource land designation, its "mineral" use zoning classification and the geographic conditions of the site, Glacier argues the Board correctly interpreted it as a commercially significant mining operation which necessarily includes the barge-loading facility. When interpreting statutes or regulations, this court's primary objective is to ascertain and give effect to legislative intent.[35] To discern legislative intent, we start with the statute's plain language and ordinary meaning, but we also look to "the applicable legislative enactment as a whole, harmonizing its provisions by reading them in context with related provisions and the statute as a whole."[36] If the statute remains susceptible to more than one reasonable meaning, it is ambiguous and we may resort to construction aides.[37]
¶ 21 The Master Program does not define "principal use." Thus, the definitions in KCC Title 21A (zoning), the SMA, and WAC 173-14 (Department of Ecology's Shoreline Regulations) could apply,[38] but none of these sources define "principal use" either. Appellants cite former KCC 21.04.510, which defined "principal use" as "the primary or predominant use to which the property is or may be devoted, and to which all other uses on the premises are accessory." But the County removed this definition when it replaced Title 21 with Title 21A in 1994. When a legislative body amends a statute, courts presume it intended a change.[39]
¶ 22 Title 21A does define the term "use" as an "activity or function carried out on an area of land, or in a building or structure located thereon. Any use subordinate or incidental to the primary use on a site is *40 considered an accessory use."[40] Glacier asks that we apply this definition in conjunction with the ordinary meaning of "principal."[41] Webster's defines "principal" as "most important, consequential, or influential," and "main."[42] While Glacier's proposed definition of "principal use" is appropriate, i.e., the "primary activity or function occurring on: (1) an area of land or (2) a building or structure,"[43] it still does not tell us what in fact is the primary activity or "principal use" at Glacier's site.
¶ 23 Both parties agree that the principal use is a mining operation. It is also largely undisputed that for the mine to operate at a commercially significant level, it requires barging. The issue then is whether the principal use is a commercially significant mining operation. To answer this question, we must consider the site's land use designation and zoning under the GMA and Comprehensive Plan and how that meshes with the SMA and Master Program.

B. Land Use Designation and Zoning

¶ 24 The GMA requires counties and cities to adopt a comprehensive plan and implementing development regulations that are consistent with the plan.[44] Among the many goals of the GMA is the need to preserve and utilize the remaining resource lands. RCW 36.70A.170 requires counties and cities to designate "[m]ineral resource lands that are not already characterized by urban growth and that have long-term significance for the extraction of minerals."[45] RCW 36.70A.060 requires that they adopt development regulations to assure the conservation of mineral resource lands designated under RCW 36.70A.170.[46]
¶ 25 In 1994, the County adopted its GMA Comprehensive Plan and designated Glacier's Maury Island site as mineral resource lands. The Plan's "Resource Conservation Strategy" states that mineral resource lands of long-term commercial significance for the extraction of minerals are shown as Designated Mineral Resource Sites on the Plan's Mineral Resources Map.[47] Glacier's site is a "Designated Mineral Resource Site" on this map.[48] The Plan further states mineral resources shall be conserved for productive use through the use of "Designated Mineral Resource Sites where the principal and preferred land uses will be commercial resource management activities."[49]
¶ 26 The King County Zoning Code, Title 21A KCC (Zoning Code), implements the Comprehensive Plan's policies and objectives. The County zoned Glacier's site "M", or "mineral." Under KCC 21A.04.050, the purpose of the mineral zone "is to provide for continued extraction and processing of mineral and soil resources in an environmentally responsible manner."
*41 ¶ 27 The appropriate question, then, is what is the property's intended use, not what has it been used for.[50] The County encourages commercial mining at the site and has placed no restrictions on the intensity of the mining operation. Under the GMA, Comprehensive Plan, and Zoning Code, Glacier's site is designated for a commercially significant mining operation regardless of the site's past use.

C. Relationship Between the GMA and SMA

¶ 28 Appellants assert the upland site's mineral use designation under the GMA, Comprehensive Plan, and Zoning Code does not dictate the principal use.[51] They argue the SMA and Master Program take priority over the GMA, and nothing in the SMA or Master Program allows commercial viability to determine the principal use. Because the mine has operated without barging for most of its existence, they contend the principal use is not a "commercially significant" mining operation and the barge-loading facility merely provides an economic advantage, rendering the mining operation water related under the Master Program. Glacier maintains the Board properly considered the interaction between the SMA and Master Program and the site's mineral use designation and zoning under the GMA in ruling the principal use is the integrated mining operation, including the barge-loading facility.
¶ 29 In Biggers v. City of Bainbridge Island, Division Two held that RCW 36.70A.480, a provision of the GMA which applies to the SMA, dictates that the SMA policies and regulations take priority over those adopted under the GMA, provided the provisions are internally consistent with the statutes enumerated in RCW 36.70A.480(3).[52] The court held the "GMA clearly specifies that [the SMA] governs the unique criteria for shoreline development. In other words, the SMA trumps the GMA in this area."[53] We respectfully disagree. RCW 36.70A.480 does not say that, and in fact it requires that regulations implementing the two statutes be harmonized in the process of overall land use planning and regulation.[54]
¶ 30 As the Board noted, the GMA includes a provision requiring that shoreline master programs and GMA comprehensive plans be harmonized:
(1) For shorelines of the state, the goals and policies of the shoreline management act as set forth in RCW 90.58.020 are added as one of the goals of this chapter as set forth in RCW 36.70A.020 without creating an order of priority among the fourteen goals. The goals and policies of a shoreline master program for a county or city approved under chapter 90.58 RCW shall be considered an element of the county or city's comprehensive plan. All other portions of the shoreline master program for a county or city adopted under chapter 90.58 RCW, including use regulations, shall be considered a part of the county or city's development regulations.
(2) The shoreline master program shall be adopted pursuant to the procedures of chapter 90.58 RCW rather than the goals, *42 policies, and procedures set forth in this chapter for the adoption of a comprehensive plan or development regulations.
(3) The policies, goals, and provisions of chapter 90.58 RCW and applicable guidelines shall be the sole basis for determining compliance of a shoreline master program with this chapter except as the shoreline master program is required to comply with the internal consistency provisions of RCW 36.70A.070, 36.70A.040(4), 35.63.125, and 35A.63.105.[55]
¶ 31 RCW 36.70A.480 specifically states that a county's shoreline master program goals and policies are part of that county's GMA comprehensive plan, and the County's shoreline master program regulations are development regulations. Consistent with this provision, the GMA defines "[d]evelopment regulations" as "the controls placed on development or land use activities by a county or city, including, but not limited to, zoning ordinances, critical areas ordinances, shoreline master programs, official controls, planned unit development ordinances, subdivision ordinances, and binding site plan ordinances together with any amendments thereto."[56] In accordance with the GMA, the County adopted its Shoreline Policies as part of its Comprehensive Plan and its Shoreline Code as part of its GMA development regulations.[57] RCW 36.70A.040(4) states that development regulations must be consistent with and implement the comprehensive plan.[58] Any other interpretation would create chaos in attempts to implement and apply the numerous, varied and sometimes competing policies and regulations governing the use of land.
¶ 32 While a specific development regulation may prevail over an inconsistent comprehensive plan provision,[59] it is an overarching principle of statutory construction that related statutory provisions be read as complementary rather than conflicting.[60] We cannot read statutes and regulations to create a conflict. Rather, we are required to harmonize them when possible.[61] The Master Program's definition of water dependency is not, as appellants argue, inconsistent with the County's designation of a site for mineral resource use. Nothing in the Master Program prohibits a commercially significant mining operation from being the principal use at Glacier's upland site, a site that the County has designated as a mineral resource. Appellants argue that the site's mineral designation does not necessarily mean its principal use is a commercially significant mining operation. But as the interplay of shoreline and GMA policies and designations demonstrates, that is exactly what it means.
¶ 33 The barge-loading facility falls under the SMA and Master Program because it is located in a shoreline environment, and it must comply with their provisions. To this end, both the shoreline and GMA policies and regulations permit the County to impose conditions that will eliminate or diminish environmental impacts.[62] But this does not *43 change the designation of the Glacier site's principal use as a commercially significant mining operation under the GMA, Comprehensive Plan, and Zoning Code. Because it cannot be a commercially significant mineral resource land without the barge facility, it is a water dependent use under the applicable requirements for shoreline developments. If the County wants to prohibit commercially significant mining as the principal use, it must do so directly through a zoning change, not by interpreting its Master Program to create conflicts in violation of RCW 36.70A.480(3) and .040(4).
¶ 34 Because Glacier's property is located on a small island without feasible large-scale ground transportation options, it cannot operate consistent with its principal use as a commercially significant mine without transporting materials by barge.[63] Thus the barge-loading facility is an integral part of the principal use.[64] The Department of Ecology's (DOE) latest Shoreline Guidelines define a "[w]ater-dependent use" as "a use or portion of a use which cannot exist in a location that is not adjacent to the water and which is dependent on the water by reason of the intrinsic nature of its operations."[65] This definition supports the Board's conclusion that the principal use consists of the integrated mine and barge-loading facility. Because, as the Board ruled, the principal use of Glacier's site is the integrated facility, the "land-water interface" required for the barge-loading facility does not merely confer cost savings or a revenue differentiating advantage. Rather, it is necessary to operate Glacier's site consistent with the principal use for which it is zoned  as a commercially significant mining operation.
¶ 35 POI contends that the Board's water dependency conclusion conflicts with its previous decision in Department of Ecology v. Hama Hama.[66] In Hama Hama, the Board ruled that a proposed barge-loading facility for a sand and gravel mine located along Hood Canal was not water dependent, but instead was at best arguably water related. But, as the Board noted, Hama Hama is easily distinguished from this case. The definition of water dependency that applied when Hama Hama was decided was narrower than the definition in the Master Program here or the definition now used by the Department of Ecology (DOE). The mining operation in Hama Hama was not on an island and did not necessarily require the "land-water interface" Glacier's location demands. In addition, Hama Hama was decided in 1976, shortly after the SMA was adopted and long before the GMA and its resource use policies became law. Finally, the Board's decision in that case did not consider any of the myriad mitigation measurements included here. The Board correctly ruled that Glacier's proposed barge-loading facility is a water dependent use.

III. Commercial or Industrial Development

¶ 36 POI argues the Board erred by ruling on summary judgment that the barge-loading facility is a resource use rather than a commercial or industrial development. There are no disputed issues of fact, so if it is not an erroneous interpretation of the applicable law, we will uphold the Board's interpretation.[67] *44 POI contends the Master Program does not define "industrial development" or "commercial development," so those terms should be given their common meaning. It maintains the facility falls within the common meaning of either of these terms. Glacier argues the Board and DDES correctly ruled that under the Master Program, the facility is not prohibited as a commercial or industrial development.
¶ 37 The Shoreline Code prohibits commercial and industrial development in the Conservancy Environment, but it does not define those terms.[68] The Shoreline Policies do discuss both terms: "[c]ommercial development pertains generally to the use or construction of facilities for transaction and sale of goods and services as opposed to industrial development (treatment together with ports) which pertains to the design and fabrication of products."[69] The Shoreline Policies also provide that "[c]ommercial and industrial uses other than commercial forestry, agriculture, fisheries and mining should be discouraged."[70] Importantly, the "policies do not attempt to disallow utilization of the mineral resource. Rather, their intent is to protect the shoreline resource."[71] As the Director of DDES noted in the Report and Decision, the Master Program discusses commercial, industrial, and mining uses separately,[72] further indicating the County does not consider mining operations a commercial or industrial use in the Conservancy Environment. Under this scheme, the integrated mine and barge-loading facility is not a commercial or industrial operation.
¶ 38 The Board ruled, "[i]n order to construe the [Master Program] Regulations and Policies as a whole, it cannot be concluded that the County sought to prohibit sand and gravel mining in the conservancy designation as a `commercial' or `industrial' activity at the same time that it specifically stated that mining is not discouraged."[73] The Board's interpretation is correct. POI's interpretation of the Master Program language would be contrary to the County's intent as demonstrated by its adopted shoreline policies.

IV. Shoreline Conditional Use Permit

¶ 39 Under KCC 25.32.050, the County may issue a shoreline conditional-use permit only if: (1) the development is compatible with uses permitted in the master program environment in which the development is proposed; (2) the use will cause "no unreasonable adverse effects" on the shoreline or surrounding areas and uses; (3) the use will not interfere with public use of surface waters; and (4) the development of the site will not be contrary to the policies of the applicable master program. POI argues the facility fails to satisfy any of the four criteria. DDES ruled the facility is contrary to its Master Program policies for the Conservancy Environment.
¶ 40 Appellants do not object to any of the Board's findings of fact;[74] thus those findings are verities on appeal.[75] Nor do they contend the Board applied the wrong standard. This court will only reverse the Board's order if it erroneously interpreted or applied the law,[76] or if its conclusions are not supported by substantial evidence.[77] Here we give substantial weight to the Board's interpretation of the SMA and Master Program, as they are within its area of expertise.[78] *45 Substantial evidence is that sufficient to persuade a reasonable person of the truth or correctness of the order.[79]

A. Compatibility with Permitted Uses in the Conservancy Environment

¶ 41 POI argues the barge-loading facility is a highly intensive use of the shoreline that will directly conflict with ongoing recreational uses, including scuba diving and boating. It contends noise and aesthetic impacts also demonstrate incompatibility, and the Board's restrictions on operating hours do not solve the problem. Preferred uses in the Conservancy Environment include those which are "nonconsumptive of the physical and biological resources of the area."[80] Compatible recreational activities are encouraged. Commercial and industrial uses are discouraged, with the explicit exception of commercial forestry, fisheries, agriculture, and mining. Some residential development is permitted.
¶ 42 The project area is used for many recreational activities, including motorboats, kayaks, scuba diving, canoes, beach walking, and watching wildlife. It is especially suited for scuba diving because of its underwater characteristics. The FEIS concluded that diving opportunities along the shoreline would be essentially eliminated during the facility's operating hours, and the area's attractiveness for recreational boaters would be reduced. It also concluded noise could be a problem but was not expected to significantly affect enjoyment of residential use or the quality of the environment. The Board relied in part on the FEIS for its findings and concluded the facility, as proposed, would interfere with permitted recreational and residential uses.[81]
¶ 43 But the Board also found that 90 percent of the recreational activity occurred on weekends[82] and specifically noted the FEIS's conclusion that noise problems are more likely to occur from 11:00 p.m. to 5:00 a.m. Further, the surface area of the new steel dock will be more open and fewer square feet than the original wooden dock, although the new dock will extend farther into the water.[83] The 228 wood pilings in the current dock will be replaced by significantly fewer steel pilings.
¶ 44 The Board ultimately concluded the facility would be compatible with permitted uses if it restricted Glacier's hours of operation to 7:00 a.m. to 7:00 p.m., Monday through Friday. It included this condition in its order. While the Board's restrictions cannot entirely alleviate the impact on other permitted uses, substantial evidence supports the Board's conclusion that the restrictions make the facility compatible with permitted uses.[84]

B. Unreasonable Adverse Effects

¶ 45 POI argues the barge-loading facility will cause significant adverse impacts to near-shore critical habitat and the surrounding human population. It contends the facility will be imposed directly into the critical habitat and its noise and aesthetic impacts will impair nearby residents' enjoyment of the area. Glacier contends substantial evidence *46 supports the Board's determination to the contrary that any adverse impacts on surrounding properties are not "unreasonable." The Board agreed with DDES's conclusion that "unreasonable adverse effects" in KCC 25.32.050(2) means essentially the same thing as "significant adverse environmental impacts" in SEPA.[85] The Board also agreed with the DDES's determination that the barge-loading facility was unlikely to cause unreasonable adverse effects on the shoreline or surrounding properties.
¶ 46 As Glacier notes, simply because the barge-loading facility is located in critical habitat does not mean that any and all impacts are significant. POI contends there is still a dispute over the facility's impact on critical habitat, but it does not identify what those impacts are or why they are unreasonably adverse. Glacier has modified its proposal several times in response to the 2000 FEIS and has incorporated the FEIS's mitigation recommendations in modified proposals.
¶ 47 The proposal approved by the Board requires greater distances between the new dock and sensitive eelgrass beds, specific tugboat approach and departure protocols, and a haulback system using winches and cables instead of tugboats to move the barges along the dock during loading. These are all measures designed to minimize impacts to eelgrass. The barge-loading facility intersects the mile-long shoreline in one location, the same place as the existing dilapidated facility, leaving the majority of the shoreline free from physical intrusion. It is located approximately in the middle of the shoreline, providing as much of a buffer as possible between it and adjacent residential communities. The portion of the conveyer system running over the beach and water will be enclosed to prevent spillage and reduce noise and dust. Further, as mentioned above, the dock itself will have less of a footprint, based on total square feet, open configuration and number of pilings, than did the original dock. Substantial evidence supports the Board's conclusion that the barge-loading facility will not cause unreasonable adverse effects on the shoreline or surrounding areas and uses.

C. Interference with Public Use of Surface Waters

¶ 48 POI argues the barge-loading facility will interfere with normal public use of surface waters. The Board disagreed with DDES's conclusion that the facility would not interfere with public use of surface waters, but it ruled that the condition it imposed limiting the hours of operation protects the recreational and aesthetic values that depend on public use of surface waters. As noted above, substantial evidence supports this conclusion. Substantial evidence also supports the Board's related conclusion that the hours of operation condition prevents undue interference with public use of surface waters.

D. SMA and Master Program Policies

¶ 49 POI and the County argue the barge-loading facility is inconsistent with SMA and Master Program policies. DDES relies on the Conservancy Environment's designation as the second-most restrictive shoreline designation and its earlier conclusion that the barge-loading facility would produce a level of activity to "rival even an intensive industrial use."[86] POI contends the facility is inconsistent with five different Master Program policies. The Board concluded that its conditions on use and Glacier's mitigation measures brought the project into compliance with all relevant policies.[87]
¶ 50 The "Conservancy Environment" section of the Shoreline Policies states
The Conservancy Environment consists of... shoreline areas which are primarily free from intensive development. It is the most suitable designation for shoreline areas of high scenic or historical values, for *47 areas unsuitable for development due to biophysical limitations and for commercial forest lands.
Conservancy areas are intended to maintain their existing character. This designation is designed to protect, conserve, and manage existing natural resources and valuable historic and cultural areas. The preferred uses are those which are nonconsumptive of the physical and biological resources of the area.[88]
Developments should be "regulated so as to minimize the following: erosion or sedimentation, the adverse impact on aquatic habitats and substantial degradation of the existing character of the Conservancy Environment."[89] As noted above, commercial and industrial uses are discouraged in the Conservancy Environment, with the express exception of commercial forestry, agriculture, fisheries, and mining.
¶ 51 As we have already ruled, substantial evidence supports the Board's conclusion that its conditions, combined with Glacier's mitigation measures, minimize the adverse impact on aquatic habitat and prevent substantial degradation of the area's existing character. Further, the shoreline area already includes the original, dilapidated barge-loading facility. Thus the aesthetic impact of the new facility is less than if the shoreline were pristine.[90]
¶ 52 The "Mining" section of the Shoreline Policies states
The Puget Sound area is particularly rich in reserves of non-metallic minerals. Sand, gravel, clay, coal, cement, and stone are produced in quantity for the construction industry, and comprise over ninety-six percent of the total recorded mineral production value in the area.
Although the total amount of land that is presently occupied by mines or will be needed for future mineral industries is extremely small, the need for land for these industries is extremely critical.
....
Many of the most valuable deposits of sand and gravel are located on the marine shoreline and in or near beds of rivers. The conflicts between economic interest and environmental concern in these situations is obvious, but with good management of both the shoreline resource and the mineral resource those conflicts can be addressed and resolved without harm to either. These policies do not attempt to disallow utilization of the mineral resource. Rather, their intent is to protect the shoreline resource.[91]
Other mining policies provide that mining should not be allowed in unique and fragile areas, mining industries should allow "natural shoreline systems to function with a minimum of disruption during their operations and should return the site to as near natural a state as possible upon their completion[,]" and mining in or under shoreline waters should be discouraged.[92]
¶ 53 The County asserts the balance struck by the mining policies dictates against allowing Glacier's barge-loading facility. DDES reached this conclusion in its permit decision, stating "special protections apply to over-water uses in the conservancy environment. Unless such activities are water dependent, they are not allowed. This is even the case where, as here, best management practices are implemented and appropriate mitigation measures are implemented."[93] As we discussed earlier, the barge-loading facility is water dependent. And, in addition to operating hour limitations, Glacier will maintain a *48 400-foot buffer between its upland mining activities and the shoreline. Glacier's monitoring and mitigation measures allow the shoreline systems to function with minimum disruption, and mining will not occur in or under shoreline waters. Substantial evidence supports the Board's conclusion that the proposed development is consistent with Master Program mining policies.
¶ 54 POI contends Glacier's proposed development is inconsistent with additional Shoreline Policies which give lowest priority to non-shoreline dependent uses and encourage such uses to locate away from the shoreline,[94] give priority to shoreline economic development of renewable over non-renewable resources,[95] encourage setting aside shoreline areas with special recreation qualities not easily duplicated for public use and enjoyment,[96] and recommend non-shoreline dependent industrial uses be located away from the shoreline.[97] This argument is not persuasive for several reasons. The barge-loading facility is a shoreline dependent use.[98] The portion of the mining operation that consumes non-renewable resources, the mine itself, is located outside the shoreline environment. Limitations on operating hours and mitigation measures keep the shoreline area largely available for the public's recreational activities. And finally, as the Board and DDES properly concluded, mining is a resource use, not an industrial use.
¶ 55 POI also asserts the proposed development is inconsistent with the SMA's policies for uses within shorelines of statewide significance. The SMA states "it is the policy of the state to provide for the management of the shorelines of the state by planning for and fostering all reasonable and appropriate uses."[99] In developing master programs for shorelines of statewide significance, local governments shall give preference to uses that, in order of preference, (1) recognize and protect statewide interest over local interest, (2) preserve the shoreline's natural character, (3) result in long term benefit, (4) protect the shoreline's resources and ecology, (5) increase public access to publicly owned shoreline areas, and (6) increase public recreational opportunities in the shoreline.[100] The SMA also states the "public's opportunity to enjoy the physical and aesthetic qualities of the natural shorelines of the state shall be preserved to the greatest extent feasible," and preferred uses include those "unique to or dependent upon use of the state's shoreline."[101] Permitted uses in shorelines "shall be designed and conducted in a manner to minimize, insofar as practical, any resultant damage to the ecology and environment of the shoreline area and any interference with the public's use of the water."[102]
¶ 56 While both local and statewide shoreline policies are important to implementing the SMA, they are only policies and, as such, cannot specify what uses and mitigation measures may be appropriate at a given site. Glacier seeks to extract an important material from its designated resource land, a use recognized and encouraged by both the SMA and the GMA. The County has designated this property to permit extraction, and transportation of the material is essential to that operation. Because the barge-loading facility is a necessary part of Glacier's island-located commercially significant mining operation, it depends on using a state shoreline. It is a reasonable and appropriate use of that shoreline because it enables Glacier to use its *49 site consistent with the site's designated use under the GMA, Comprehensive Plan, and Zoning Code. The operating hour conditions and mitigation measures will preserve to the greatest extent feasible the public's opportunity to enjoy the shoreline's natural character and its other resources and ecology. Further, the SMA's use preferences are just that, preferences. Although the mining facility may not be at the top of the SMA's "preferred use" list, it is a permitted use nonetheless because it is dependent upon the shoreline and designed to exist compatibly with other preferred uses. Substantial evidence supports the Board's conclusion that the proposed facility is consistent with the policies of the SMA.[103]

V. Final Environmental Impact Statement

¶ 57 POI argues the Board erred in concluding that the SEPA review was adequate. It contends the FEIS failed to adequately address noise impacts and impacts to marine mammals. The County and Glacier contend DDES exceeded its obligation to conduct a reasonably thorough investigation of the significant, probable environmental consequences of Glacier's proposal.
¶ 58 The adequacy of an EIS is a question of law, which this court reviews de novo.[104] However, we accord substantial weight to the governmental agency's determination that an EIS is adequate.[105] We apply a clearly erroneous standard of review and will only reverse DDES's SEPA determination if we are "`left with the definite and firm conviction'" that the County made a mistake.[106]
¶ 59 The adequacy of an EIS focuses on the legal sufficiency of the data in the EIS.[107] Sufficiency of the data is measured by the "`rule of reason,'"[108] which requires a "`reasonably thorough discussion of the significant aspects of the probable environmental *50 consequences.'"[109] SEPA does not require analysis of every possible impact:
"[A]n EIS is not a compendium of every conceivable effect or alternative to a proposed project, but is simply an aid to the decision making process. That is, the EIS need include only information sufficiently beneficial to the decision making process to justify the cost of its inclusion. Impacts or alternatives which have insufficient causal relationship, likelihood, or reliability to influence decisionmakers are `remote' or `speculative' and may be excluded from an EIS."[110]

A. Noise Impacts

¶ 60 POI argues the FEIS failed to address the impact of increased noise levels on surrounding communities, used an insufficient standard for acceptable noise levels, failed to analyze actual expected noise, and completely failed to analyze noise impacts on recreational users and fish and marine mammals. The FEIS relied in part on a noise analysis submitted by acoustic engineers which used the existing community noise levels[111] and levels at a similar mining operation to create a sound model predicting the proposed project's noise impacts under a variety of operating conditions.[112]
¶ 61 Noise modeling was completed for each of the six different expected mining phases. The FEIS compared anticipated noise levels with County standards for noise from an industrial noise source migrating to a residential area: 57 dBA maximum during daytime and 47 dBA maximum during nighttime.[113] Measured and modeled sound levels were based on the maximum anticipated activity  mining, processing, and barging  during calm weather conditions, in any single hour. Under this analysis, sound levels at 17 different residential receptor sites ranged between 41 and 51 dBA during the day. These are all within the existing ambient noise levels in adjacent communities. All additional sound level measurements, taken under different conditions, fell within King County Code limits with the exception of one nighttime measurement at one of the 17 receptor sites. Because the Board limited the hours of operation to 7 a.m. to 7 p.m., this measurement is no longer relevant. Ultimately, the FEIS concluded that although neighbors would likely hear the project, there were no expected significant unavoidable adverse noise impacts. As the Board noted, although the FEIS's comparison of project noise to King County Code limits is not dispositive, the issue is whether its review was adequate. Given its extensive use and analysis of valid modeling results and measurements, the FEIS provided a reasonably thorough discussion of noise impacts.[114]
¶ 62 The FEIS also addressed noise impacts from pile driving and barge loading on fish and marine mammals.[115] It concluded that although juvenile salmon likely congregated around eelgrass beds near the barge-loading facility, studies have shown the overall effect on salmon from noise and vibration from piling driving and barge loading would be relatively minor. It also concluded marine mammals in Puget Sound were accustomed to shipping traffic and port activities such that any noise from construction and barge loading would have a negligible effect on them.

*51 B. Impacts on Marine Mammals

¶ 63 POI argues the FEIS failed to evaluate the project's significant impacts on marine mammals. It relies on testimony first introduced in the Board hearing, well after the FEIS was issued. POI did not present the testimony to DDES, so the FEIS could not have possibly addressed the alleged impacts POI raised at the Board hearing. Moreover, the FEIS did address project impacts on marine mammals. Besides recognizing that marine mammals were accustomed to shipping and port activity in the Puget Sound area, the FEIS noted that the project site is not located at major feeding grounds, congregation points, breeding areas, or migration routes. It determined the most likely effect was that harbor seals would avoid the area during barge loading. It also determined that although killer whales, or orcas, travel throughout Puget Sound, the project was unlikely to affect them because they were accustomed to this type of activity. It noted that although orca populations have been declining in Puget Sound, no one cites activities such as this in central Puget Sound as a factor in the decline. The FEIS thus provided a reasonably thorough discussion of impacts to marine mammals, and the Board did not err in concluding the EIS was adequate.

VI. Supplemental EIS

¶ 64 Finally, POI argues the Board erred by concluding that a supplemental EIS was not necessary. It contends the FEIS Addendum failed to adequately address concerns about potential propeller wash impacts because uncertainties about those impacts remain. The County and Glacier argue that given Glacier's mitigation measures in response to eelgrass concerns, the post-FEIS changes in its proposal did not result in probable new significant adverse environmental impacts. We accord substantial weight to the County's and the Board's determination that a supplemental EIS is not required.[116]
¶ 65 SEPA requires a supplemental EIS if there are substantial changes to a proposal which are themselves likely to have significant adverse environmental impacts, or when new information indicates a proposal's "probable significant adverse environmental impacts" were not previously covered by "the range of alternatives and impacts analyzed in the existing environmental documents."[117] DDES concluded in its Addendum that a supplemental EIS is not required because none of the changes in Glacier's proposal were likely to result in significant adverse impacts and there was no new information indicating probable significant environmental impacts which had not already been covered in the FEIS.[118] It determined that although impacts to eelgrass remained possible and were somewhat uncertain, Glacier's mitigation measures reduced potential impacts and the likelihood of those impacts to nonsignificant levels.[119]
¶ 66 The FEIS specifically identified propeller wash as a potential significant impact to eelgrass in the dock area.[120] It did not provide quantitative analysis of the potential impacts specific to Glacier's barge-loading facility, but stated that based on previous studies, "direct prop wash from tugs could affect eelgrass up to at least 100 feet away and probably considerably further."[121] It acknowledged that propeller wash modeling could not predict an exact limit of impact, but concluded considerable damage is reasonably expected from propeller wash oriented directly at eelgrass beds.[122] It suggested several *52 mitigation measures to minimize potential damage from propeller wash, several of which Glacier incorporated into the proposal that DDES ultimately analyzed in the Addendum.[123]
¶ 67 Glacier and POI submitted voluminous, conflicting text and analysis about expected propeller wash velocities, distances, and effects on eelgrass. They offered conflicting expert technical modeling equations to simulate expected propeller wash velocities and impacts at Glacier's site. DDES brought in a third party environmental consultant to evaluate the information and decide which model better replicated expected conditions. It adopted the consultant's findings and conclusions, including that eelgrass impacts remained uncertain because neither party's model could adequately predict propeller wash impacts at Glacier's site. Based on information submitted after completion of the FEIS, DDES concluded the dock extension recommended in the FEIS was insufficient to bring propeller wash velocities below damage thresholds.[124]
¶ 68 Ultimately DDES relied on Glacier's model, deemed the more accurate of the two by the consultant, in concluding a reasonably "safe" distance between the dock and eelgrass beds was 115 feet.[125] It did not claim this distance eliminated the potential for adverse impacts, but rather that the 120 feet proposed by Glacier, combined with the other mitigation measures, meant Glacier's post-FEIS proposal changes would not result in probable significant adverse impacts on eelgrass. POI contends the County failed to analyze the uncertainty of the propeller wash impacts. We disagree. DDES thoroughly considered the remaining uncertainties and concluded Glacier's mitigation measures reduced those uncertainties to acceptable levels such that a supplemental EIS was not required. DDES and the Board correctly concluded that a supplemental EIS would do nothing more to enhance the information available to the decision-maker. A supplemental EIS was not required.
¶ 69 We affirm.
WE CONCUR: DWYER and COX, JJ.
NOTES
[1] Northwest Aggregates Company is owned by Glacier Northwest Holding, Inc., a wholly-owned subsidiary of Glacier Northwest, Inc. Both the County and Board refer to the company as "Glacier Northwest" or "Glacier."
[2] The aquatic lands lease was initiated in 1968 and renewed in 1978 and 1988. Glacier applied for lease renewal in 1999 and 2001.
[3] Glacier also owns a sand and gravel mine in Steilacoom on which it has relied heavily in recent years. Glacier has held the Maury Island mine in reserve while it focused activity at the Steilacoom site, which is now depleted and ending operations.
[4] Eight years ago when Glacier filed its application, this figure was premised on the mine being used to provide sand and gravel for the Third Runway Expansion project at SeaTac International Airport. As the phase of that project for which Glacier's product was to be used is essentially complete, it expects current mining levels to be lower.
[5] The DEIS was the subject of extensive public comments, and over 1,600 people attended community meetings about the proposal and the DEIS.
[6] FEIS, Volume I at S-12.
[7] On May 28, 2003, the County issued an initial addendum to the FEIS. Shortly thereafter it withdrew the addendum because it did not include materials POI submitted after the deadline raising concerns about noise and propeller wash impacts on eelgrass.
[8] Under RCW 2.06.030, parties may appeal from a final quasi-judicial decision directly to this court if the appeal is certified by the Superior Court.
[9] RCW 90.58.080; Weyerhaeuser Co. v. King County, 91 Wash.2d 721, 729, 592 P.2d 1108 (1979).
[10] RCW 90.58.140(1). The "[m]aster program" is the "comprehensive use plan for a described area, and the use regulations together with maps, diagrams, charts, or other descriptive material and text, a statement of desired goals, and standards developed in accordance with the policies enunciated in RCW 90.58.020." RCW 90.58.030(3)(b).
[11] RCW 90.58.140(2)(b); Weyerhaeuser, 91 Wash.2d at 729, 592 P.2d 1108.
[12] RCW 90.58.170, .180.
[13] KCC 25.32.010(B) (substantial development permit); KCC 25.32.050(A) (conditional-use permit).
[14] See Ex. 8, King County Shoreline Environments Map (Vashon and Maury Islands); ch. 25.24 KCC.
[15] As we explain in Section V, infra, a different standard applies to an agency's determination under SEPA that an EIS is adequate. RCW 43.21C.090.
[16] RCW 90.58.180(3).
[17] RCW 34.05.558; Batchelder v. City of Seattle, 77 Wash.App. 154, 158, 890 P.2d 25 (citing Franklin County Sheriff's Office v. Sellers, 97 Wash.2d 317, 323-24, 646 P.2d 113 (1982), cert. denied, 459 U.S. 1106, 103 S.Ct. 730, 74 L.Ed.2d 954 (1983)), review denied, 127 Wash.2d 1022, 904 P.2d 1157 (1995).
[18] Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 154 Wash.2d 224, 233, 110 P.3d 1132 (2005) (citing City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wash.2d 38, 46, 959 P.2d 1091 (1998)).
[19] Id. (quoting City of Redmond, 136 Wash.2d at 46, 959 P.2d 1091).
[20] RCW 34.05.570(3)(c), (d).
[21] RCW 34.05.570(1)(a).
[22] This court also defers to an agency's interpretation of its own regulations. Port of Seattle v. Pollution Control Hearings Bd., 151 Wash.2d 568, 593, 90 P.3d 659 (2004) (citing Postema v. Pollution Control Hearings Bd., 142 Wash.2d 68, 77, 11 P.3d 726 (2000)).
[23] RCW 90.58.050. The Department of Ecology "shall act primarily in a supportive and review capacity with an emphasis on providing assistance to local government and on insuring compliance with the policy and provisions of this chapter." Id.
[24] Weyerhaeuser Co. v. King County, 91 Wash.2d 721, 736, 592 P.2d 1108 (1979). See also Bellevue Farm Owners Ass'n v. Shorelines Hearings Bd., 100 Wash.App. 341, 351, 997 P.2d 380 (citing Buechel v. Dep't of Ecology, 125 Wash.2d 196, 202, 204, 884 P.2d 910 (1994)), review denied, 142 Wash.2d 1014, 16 P.3d 1265 (2000).
[25] Buechel, 125 Wash.2d at 203, 884 P.2d 910 (citing Kitsap County v. Dep't of Natural Res., 99 Wash.2d 386, 392, 662 P.2d 381 (1983)).
[26] Id. (citing William H. Chapman, Substantive Decision-Making Under the Washington Shoreline Management Act, 9 U. PUGET SOUND L.REV. 337, 377 (1986)).
[27] RCW 36.70A.3201.
[28] Quadrant, 154 Wash.2d at 245, 110 P.3d 1132 (citing Richard L. Settle, Washington's Growth Management Revolution Goes to Court, 23 SEATTLE U.L.REV. 5, 34 (1999)).
[29] Buechel, 125 Wash.2d at 203, 884 P.2d 910 (citing Weyerhaeuser Co. v. King County, 91 Wash.2d at 736, 592 P.2d 1108; English Bay Enters., Ltd. v. Island County, 89 Wash.2d 16, 21, 568 P.2d 783 (1977); Hayes v. Yount, 87 Wash.2d 280, 289, 552 P.2d 1038 (1976); 4 Real Property Deskbook, at 84-45; Hama Hama Co. v. Shorelines Hearings Bd., 85 Wash.2d 441, 448-49, 536 P.2d 157 (1975); Chapman, 9 U. PUGET SOUND L.REV. at 351-52).
[30] Notably, the County does not argue that its interpretations warrant deference.
[31] KCC 25.24.030(A).
[32] KCC 25.08.590.
[33] KCC 25.08.600.
[34] RCW 34.05.570(3)(d).
[35] Quadrant, 154 Wash.2d at 238, 110 P.3d 1132 (citing King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 555, 14 P.3d 133 (2000)).
[36] Id. at 239, 110 P.3d 1132 (citing King County, 142 Wash.2d at 555, 560, 14 P.3d 133).
[37] State ex rel. Citizens Against Tolls v. Murphy, 151 Wash.2d 226, 242-43, 88 P.3d 375 (2004).
[38] See KCC 25.08.010.
[39] Spokane County Health Dist. v. Brockett, 120 Wash.2d 140, 154, 839 P.2d 324 (1992) (citing Johnson v. Morris, 87 Wash.2d 922, 926, 557 P.2d 1299 (1976); Fisher Flouring Mills Co. v. State, 35 Wash.2d 482, 490, 213 P.2d 938 (1950)).
[40] KCC 21A.06.1345.
[41] See Quadrant, 154 Wash.2d at 239, 110 P.3d 1132 (citing Dahl-Smyth, Inc. v. City of Walla Walla, 148 Wash.2d 835, 842-43, 64 P.3d 15 (2003)).
[42] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1802 (1971).
[43] This definition is the functional equivalent of the definition of "principal use" in former KCC 21.04.685. Appellants do not dispute that this definition is appropriate, and the County even acknowledges it in its Reply Brief on appeal.
[44] RCW 36.70A.040(3).
[45] RCW 36.70A.170(1)(c).
[46] Conservation in this context means "to assure that the natural resource lands will remain available to be used for commercial production of the resources designated." WAC 365-195-825(1)(b).
[47] Ex. 296; King County Comprehensive Plan 2000, p. 3-25.
[48] Ex. 8; FEIS Volume 1, p. 9-8.
[49] Ex. 296; King County Comprehensive Plan 2000, p. 3-25. Notably, the Plan posits that "[c]onflicts with surrounding land uses and environmental problems can arise even with the best of precautions. Resource-based industries need reasonable certainty that operations can continue if activities are performed in an environmentally sound manner." Ex. 296; King County Comprehensive Plan 2000, p. 3-26. To this end, the Plan states that conditions to mitigate significant adverse environmental impacts associated with mining operations should be required for, among other things, surface water quality, noise levels, vibration, land and shoreline uses, and visual impacts. Ex. 296; King County Comprehensive Plan 2000, p. 3-39.
[50] Ironically, the Master Program's former definition of "principal use," which appellants argue should be applied here, provides further support for the conclusion that a site's principal use is based on its designated use, not its past use. Former KCC 21.04.510 defined "principal use" as "the primary or predominant use to which the property is or may be devoted." (Emphasis added.) Appellants cite no authority for the proposition that zoning designations limit future uses to those employed in the past. In fact, zoning regulations are designed to do just the opposite  designate the use to which the owner may put its property now or in the future.
[51] Appellants argue that this court should not give deference to the Board's water dependency interpretation because it is based on an interpretation of the County's GMA-related provisions, which are not within the Board's area of expertise. See Quadrant, 154 Wash.2d at 233, 110 P.3d 1132 (citing City of Redmond, 136 Wash.2d at 46, 959 P.2d 1091). As we discuss below, the Board cannot make SMA decisions in a vacuum, ignoring GMA and its implementing regulations. But we need not decide the deference question here because it would have no impact on our holding.
[52] Biggers v. City of Bainbridge Island, 124 Wash. App. 858, 103 P.3d 244 (2004), review granted, 156 Wash.2d 1005, 132 P.3d 146 (2006).
[53] Id. at 867, 103 P.3d 244.
[54] RCW 36.70A.040(4).
[55] RCW 36.70A.480 (emphasis added). Similarly, the goals and policies of GMA into which the Shoreline goals are incorporated, are all created equal with no priority given to any one goal. "The following goals are not listed in order of priority...." RCW 36.70A.020; Viking Props. v. Holm, 155 Wash.2d 112, 127, 118 P.3d 322 (2005); Whidbey Envtl. Action Network v. Island County, 122 Wash.App. 156, 173, 93 P.3d 885 (2004), review denied, 153 Wash.2d 1025, 110 P.3d 756 (2005).
[56] RCW 36.70A.030(7) (emphasis added).
[57] See KCC 25.04.025.
[58] RCW 36.70A.040(4)(d). This is one of the "internal consistency provisions" imposed on shoreline plans and regulations by GMA. RCW 36.70A.480(3). The Board has previously concluded that shoreline master program provisions should be construed to work in concert with the GMA. Yakama Indian Nation v. Cent. Pre-Mix Concrete Co., SHB No. 98-42, at 13 (1999).
[59] See Citizens for Mount Vernon v. City of Mount Vernon, 133 Wash.2d 861, 873, 947 P.2d 1208 (1997).
[60] Waste Mgmt. of Seattle, Inc. v. Utils. Transp. Comm'n, 123 Wash.2d 621, 869 P.2d 1034 (1994).
[61] Philippides v. Bernard, 151 Wash.2d 376, 385, 88 P.3d 939 (2004) (citing State v. Wright, 84 Wash.2d 645, 650, 529 P.2d 453 (1974)).
[62] See, e.g., Ex. 296, King County Comprehensive Plan 2000 p. 3-39. And of course SEPA remains available, as it was here, to examine environmental impacts as the basis for conditions on permitted uses. See RCW 42.21C.030.
[63] POI contends barges are not necessary because trucks could transport mining materials off the island using the car ferries. This argument is not well-taken. As the Board noted, when the Glacier site operated at a commercially significant level at varying times between 1968 and 1978, it required transportation of material by barge. Further, Glacier stated it would require 300 30-ton trucks to transport approximately the same amount as one 10,000 ton barge. The potential environmental impacts of transporting sand and gravel in these quantities by truck would be extremely significant. POI disputes neither this figure nor that the primary market for the sand and gravel from Glacier's mine is off-island.
[64] Viewing the principal use as the integrated mining operation, including the shoreline-located barge loading facility and the upland-located mine, also comports with the rule that "the intended use of adjacent lands should be considered when taking any action under the SMA in order to achieve the coordinated development of the shorelines which is the object of the SMA." Weyerhaeuser, 91 Wash.2d at 736, 592 P.2d 1108 (citing Merkel v. Port of Brownsville, 8 Wash.App. 844, 509 P.2d 390 (1973)).
[65] WAC 173-26-020(36).
[66] SHB No. 115 (1976).
[67] RCW 34.05.570(3)(d).
[68] See KCC 25.24.070 (prohibiting commercial development); KCC 25.24.120 (prohibiting industrial development).
[69] Shoreline Policies at 27.
[70] Shoreline Policies at 20.
[71] Shoreline Policies at 30.
[72] See Shoreline Policies at 27 (commercial development), 30 (mining), and 33 (ports and industries).
[73] The Shoreline Code is intended to be consistent with and implement the Shoreline Policies. See KCC 25.04.010.
[74] The Board made 76 findings of fact.
[75] State v. Rankin, 151 Wash.2d 689, 709, 92 P.3d 202 (2004) (citing State v. Hill, 123 Wash.2d 641, 644, 870 P.2d 313 (1994)).
[76] RCW 34.05.570(d).
[77] RCW 34.05.570(e); Ferry County v. Concerned Friends, 155 Wash.2d 824, 833, 123 P.3d 102 (2005).
[78] See Bellevue Farm Owners, 100 Wash.App. at 362-63, 997 P.2d 380 (citing Lund v. Dep't of Ecology, 93 Wash.App. 329, 333, 969 P.2d 1072 (1998)).
[79] Ferry County, 155 Wash.2d at 833, 123 P.3d 102 (citing Honesty in Envtl. Analysis & Legislation (HEAL) v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 96 Wash.App. 522, 526, 979 P.2d 864 (1999)).
[80] Shoreline Policies at 20.
[81] This contrasts with DDES's conclusion that the facility would not interfere with the public's use of surface waters.
[82] Findings of Fact, Conclusions of Law, and Order (Board's Order) at 35, Finding of Fact 63. In its conclusions of law, the Board stated that evidence showed that most recreational activity occurs during the summer and on weekends. Board's Order at 53, Conclusion of Law 20.
[83] Glacier's 2002 proposal listed the overall surface area of the new dock as 7,340 square feet, compared to the 8,490 square feet of the old dock. Since that time, Glacier has agreed to increase the distance the new dock extends from shore to mitigate impacts on eelgrass beds.
[84] Webster's defines "compatible" as "capable of existing together without discord or disharmony." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 463 (3d ed.1966).
[85] Board's Final Order at 55, Conclusion of Law 24.
[86] King County Report and Decision for Shoreline Conditional Use Permit, p. 15, ¶ 20, March 16, 2004.
[87] Glacier had proposed prohibiting operations from 6 a.m. Saturday until 8 p.m. Sunday. The Board ruled that this was inadequate to be fully compatible with the SMA and Master Plan policies. See Board's Order at p. 59, Conclusion of Law 32.
[88] Shoreline Policies at 20.
[89] Shoreline Policies at 21.
[90] POI points out that maintaining a shoreline's existing character does not include maintaining existing non-natural characteristics. Even if that were true, it does not change the fact that the aesthetic impact of Glacier's proposed development is lessened because it improves upon a barge-loading facility which already exists in the same area.
[91] Shoreline Policies at 30.
[92] Shoreline Policies at 31.
[93] DDES Director's Report and Decision at 15, ¶ 20 (emphasis added). Because we reject this argument on other grounds, we do not need to decide whether only water dependent resource extraction operations are permitted.
[94] Shoreline Policies at 2, Shoreline Use Element, Objectives 4(e), 8.
[95] Shoreline Policies at 5, Economic Development Element, Objective 7.
[96] Shoreline Policies at 10, Recreation Element, Objective 1.
[97] Shoreline Policies at 34, Ports and Industries, General Policy 7.
[98] The mineral resource occurs naturally and must be taken from its natural location. The development cannot be moved because the resource cannot be extracted elsewhere. As the King County Master Program recognizes, these deposits are often found on or near the shorelines of the state. See Shoreline Policies at 30.
[99] RCW 90.58.020.
[100] RCW 90.58.020.
[101] RCW 90.58.020(7).
[102] RCW 90.58.020.
[103] POI and the County also argue the barge-loading facility is an illegal nonconforming use, but because it is water dependent, it is also conforming. KCC 25.08.310 defines nonconforming uses or developments as "those uses and structures that have been lawfully established or constructed prior to November 22, 1976, which no longer conform to the applicable regulations of the master program." A nonconforming use is not necessarily an illegal use. Many nonconforming uses are permitted to remain. See City of Univ. Place v. McGuire, 144 Wash.2d 640, 648, 30 P.3d 453 (2001) ("Lawful nonconforming uses are allowed to continue for some period of time, though the local government may regulate or even terminate the nonconforming use, subject to constitutional limits.") (citing Rhod-A-Zalea & 35th, Inc. v. Snohomish County, 136 Wash.2d 1, 8, 959 P.2d 1024 (1998)). Water dependent uses are permitted in the Conservancy Environment. See KCC 25.24.030(A). When the County designated Maury Island's shoreline a Conservancy Environment, the barge-loading facility remained a permitted use because it was, and is, a water dependent use.

As the Board noted, DDES's nonconforming use analysis was based on its conclusion that because the principal use, the mine, did not require the barge-loading facility, the facility was not water dependent and was thus a nonconforming use. When the Board reversed the County and determined the facility is water dependent, it also ruled the facility is an authorized permitted use, not a nonconforming use. It addressed the nonconforming use issue "solely for the purpose of providing a complete decision on all issues raised in the appeal." Board's Order at 61. We need not consider whether the barge-loading facility is an illegal nonconforming use because the Board did not err in ruling that the facility, including Glacier's mitigation measures and the Board's required conditions, conforms to the applicable regulations and policies of the Master Program.
[104] Klickitat County Citizens Against Imported Waste v. Klickitat County, 122 Wash.2d 619, 632-33, 860 P.2d 390, 866 P.2d 1256 (1993) (citing Solid Waste Alternative Proponents v. Okanogan County, 66 Wash.App. 439, 441, 832 P.2d 503, review denied, 120 Wash.2d 1012, 844 P.2d 435 (1992); Citizens for Clean Air v. City of Spokane, 114 Wash.2d 20, 34, 785 P.2d 447 (1990)).
[105] RCW 43.21C.090; Klickitat County, 122 Wash.2d at 633, 860 P.2d 390 (citing RCW 43.21C.090; Citizens for Clean Air, 114 Wash.2d at 34, 785 P.2d 447).
[106] Kettle Range Conservation Group v. Wash. Dep't of Natural Res., 120 Wash.App. 434, 456, 85 P.3d 894 (2003) (quoting Anderson v. Pierce County, 86 Wash.App. 290, 302, 936 P.2d 432 (1997)), review denied, 152 Wash.2d 1026, 101 P.3d 421 (2004).
[107] Klickitat County, 122 Wash.2d at 633, 860 P.2d 390 (citing R. SETTLE, THE WASHINGTON STATE ENVIRONMENTAL POLICY ACT: A LEGAL AND POLICY ANALYSIS § 14(a)(i) (4th ed.1993)).
[108] Id. (quoting SEAPC v. Cammack II Orchards, 49 Wash.App. 609, 614, 744 P.2d 1101 (1987)).
[109] Id. (quoting Cheney v. Mountlake Terrace, 87 Wash.2d 338, 344-45, 552 P.2d 184 (1976)).
[110] Id. at 641, 860 P.2d 390 (alteration in original) (quoting R. SETTLE § 14(a)(i) at 157).
[111] Average existing community noise levels ranged from 43 to 53 dBA during the day and 37 to 46 dBA during the evening.
[112] POI does not dispute the validity of the science behind the FEIS's noise analysis.
[113] See FEIS Volume 1, p. 7-7. POI contends that an industrial noise standard is incorrect considering the County classified the mining operation as a "resource use." But the operation's designation as a resource use has nothing to do with the nature of the sounds it emits. There are no noise standards for "resource uses" as such.
[114] In discussing noise impacts on recreational uses, the FEIS states: "Noise and activity at the mine may detract from the recreational experiences currently available at the site and adjacent lands." FEIS Volume 1, p. 12-3. This, like the noise analysis discussed above, is a reasonable prediction of the limited impact a slight increase in existing ambient noise levels will have.
[115] See FEIS Volume 1, pp. 6-28 through 6-32.
[116] Citizens for Clean Air, 114 Wash.2d at 33-34, 785 P.2d 447.
[117] WAC 197-11-600(3)(b)(ii).
[118] FEIS Addendum at 12.
[119] FEIS Addendum at 8. DDES properly considered Glacier's mitigation measures in making its determination that a supplemental EIS was not required. WAC 197-11-330(1)(c).
[120] See FEIS Volume 1, pp. 6-21, 6-47. The Addendum noted that since the FEIS had been issued, the distribution and density of eelgrass had been further surveyed and described in greater detail. The smallest of the three patches identified in the FEIS was no longer present.
[121] FEIS Volume 1, p. 6-21, 6-22.
[122] FEIS Volume 1, p. 6-22.
[123] Mitigation measures included using a winch and cable system instead of tugs to position the barges along the dock, extending the dock farther into the water so that its face is never closer than 120 feet to the eelgrass beds, requiring tugs to follow a specific barge approach and departure protocol to direct propeller wash away from the eelgrass beds, and extensive monitoring during operations.
[124] FEIS Addendum at 7.
[125] FEIS Addendum at 7-8. DDES reached this number by extrapolating from Glacier's model's conclusion that propeller wash velocities at 100 feet from the dock were 10 cm/sec greater than the velocity at which damage to eelgrass was known to occur.